836 F.2d 1521
 10 Fed.R.Serv.3d 560, 18 Envtl. L. Rep. 20,379
 James R. CONNER, et al., Plaintiffs-Appellees,
v.
Robert BURFORD, Director, Bureau of Land Management, et al.,
Defendants- Appellants,
and
Placid Oil Company, Conquest Exploration Company, the
Louisiana Land and Exploration Company and
Anadarko Production Company, Union Oil
Company of California, et al.,
Intervenors-Appellants.
 Nos. 85-3929 to 85-3937.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1986.
Decided Jan. 13, 1988.
 
 Ellen J. Durkee and Robert L. Klarquist, Dept. of Justice, Washington, D.C., for defendants-appellants.
 Thomas France, Nat. Wildlife Federation, Missoula, Mont., for plaintiffs-appellees.
 Laura L. Payne, Poulson, Odell & Peterson, Denver, Colo.; Philip K. Verleger, Donna R. Black, Michael A. Monahan, McCutchen, Black, Verleger & Black, Los Angeles, Cal.; Constance E. Brooks, Mountain States Legal Foundation, Denver, Colo., for intervenors-appellants.
 Appeal from the United States District Court for the District of Montana.
 Before GOODWIN, WALLACE and NORRIS, Circuit Judges.
 NORRIS, Circuit Judge:
 
 
 1
 This appeal presents the question whether federal agencies violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Sec. 4321 et seq., or the Endangered Species Act of 1973 (ESA), 16 U.S.C. Sec. 1531 et seq., by selling oil and gas leases on 1,300,000 acres of national forest land in Montana without preparing either an environmental impact statement (EIS) or a comprehensive biological opinion encompassing the impact of post-leasing activities on threatened or endangered species. The district court ruled that the sale of the leases without an EIS or a comprehensive biological opinion violated both NEPA and the ESA, 605 F.Supp. 107. We affirm the judgment of the district court in part, reverse in part, and remand for further proceedings.
 
 
 2
 * FACTS AND PROCEDURAL HISTORY
 
 
 3
 The Flathead National Forest in northwestern Montana is a vast tract of rugged mountainous wilderness. Its many lakes and rivers provide exceptionally pure surface water, prized for trout fishing, and its undisturbed ecosystem is a sustaining habitat not only for game animals, but also for the bald eagle, the peregrine falcon, the gray wolf, and the grizzly bear--all listed as threatened or endangered species under the ESA.[1] The Gallatin National Forest in south-central Montana provides a tremendous diversity of natural resources. Its rugged landscape of mountains, valleys, and rivers supports abundant fish and wildlife populations, while portions of the forest also provide important timber reserves for the local logging industry. Bordered on the south by Yellowstone National Park, the Gallatin is the watershed for some of the nation's most important trout waters, including the blue-ribbon Madison River. Big game populations also teem in the wilds of the Gallatin, and 30,000 acres there have been identified as essential grizzly bear habitat.
 
 
 4
 Beneath the surface of these vast and beautiful national forests lies the reason for this litigation. Both forests are located in the geologic zone known as the Overthrust Belt, a formation running north-south from Canada to Mexico and thought to be a rich source of petroleum deposits. Since 1970, preliminary seismic explorations as well as oil seeps discovered in the area have triggered an avalanche of applications to the Bureau of Land Management (BLM) for oil and gas leases within the boundaries of the two forests.
 
 
 5
 In February and March of 1981, the United States Forest Service issued environmental assessments[2] (EAs) recommending that a total of 1,300,000 acres of land in the Flathead and Gallatin National Forests be leased for oil and gas development.[3] Based on these EAs, the Forest Service also issued Decision Notices and Findings of No Significant Impact (FONSIs),[4] which conclude that the mere sale of oil and gas leases in the forests will have no significant impact on the human environment. The issuance of the FONSIs obviated the need for EISs at the lease sale phase of the project. See 40 C.F.R. Sec. 1508.13 (1985).
 
 
 6
 Following the preparation of the EAs and the FONSIs, the BLM sold over 700 leases for oil and gas exploration, development, and production on 1,350,000 acres within the two forests. The leases fall into two basic categories depending on the nature of the stipulations written into the lease to ameliorate the environmental impact of oil and gas activities.[5] Some of the leases contain "no surface occupancy" (NSO) stipulations. On their face, these NSO stipulations appear to prohibit lessees from occupying or using the surface of the leased land without further specific approval from the BLM. Leases fully governed by an NSO stipulation are referred to herein as "NSO leases." Leases not governed by an NSO stipulation, which we refer to as "non-NSO leases," contain the Forest Service's standard stipulations for environmental protection and, in some cases, special stipulations to protect particularly sensitive areas.[6] These standard and special stipulations, which we refer to collectively as "mitigation stipulations," authorize the government to impose reasonable conditions on drilling, construction, and other surface-disturbing activities; unlike NSO stipulations, however, they do not authorize the government to preclude such activities altogether.
 
 
 7
 In addition to issuing the EAs and FONSIs under NEPA, the Forest Service also initiated formal consultations with the Fish and Wildlife Service (FWS), as required under the ESA, 16 U.S.C. Sec. 1536(b),[7] for the purpose of determining whether the surface-disturbing activities of the oil and gas lessees might jeopardize the continued existence of threatened or endangered species. Both the Forest Service and the FWS decided there was insufficient information about the nature of post-leasing oil and gas activities to render a comprehensive biological opinion considering anything more than the lease sale itself. Instead the FWS proposed ongoing consultation and preparation of additional biological opinions at various stages of post-leasing activities.
 
 
 8
 Following the issuance of the FONSIs, the EAs, and the biological opinions, administrative appeals were filed by James Conner, the Montana Wildlife Federation, and the Madison-Gallatin Alliance (appellees). See 36 C.F.R. Sec. 211.19 (1980). Protests were also filed with the BLM in order to prevent leasing before the administrative proceedings were concluded. See 43 C.F.R. Sec. 4.450-2 (1980). These appeals and protests were rejected and in 1982 leasing began in both the Flathead and Gallatin Forests.
 
 
 9
 Having exhausted their administrative remedies, the appellees then filed this action in federal district court in Montana, claiming that the sale of the leases without an EIS violated NEPA and that the sale of the leases without a biological opinion assessing the impact of post-leasing activities on the threatened and endangered species violated the ESA.
 
 
 10
 The district court granted appellees summary judgment on both their NEPA and ESA claims. Conner v. Burford, 605 F.Supp. 107 (D.Mont.1985). The court reasoned that NEPA requires a comprehensive EIS at the lease sale stage to project and analyze the cumulative effects of successive, interdependent steps culminating in oil and gas development and production. See id. at 108 (citing Thomas v. Peterson, 753 F.2d 754, 757 (9th Cir.1985)). Otherwise, the court feared, "a piecemeal invasion of the forests would occur, followed by the realization of a significant and irreversible impact." 605 F.Supp. at 109. Not even the NSO stipulations in some of the leases allayed the court's concerns: "[t]he issuance of a lease with an NSO stipulation does not guarantee an EIS before any development would occur." Id. Accordingly, the court ruled that the Forest Service's failure to prepare an EIS prior to the sale of any lease within the two national forests violated NEPA. In addition, the court ruled that the biological opinions of the FWS were inadequate to satisfy the ESA because they failed to address the effects of oil and gas activities beyond the lease sale phase. The court reasoned this failure would lead to a piecemeal evaluation of the project consequences and a progressive "chipping away" of important habitat. Id. at 109.
 
 
 11
 The district court ordered all "the agency actions allowing the issuance of the oil and gas leases on the Flathead and Gallatin National Forests ... set aside" and enjoined the government from issuing or recommending any more leases until it complied with NEPA and the ESA. Id. Soon after judgment was entered, and before the original federal defendants filed a notice of appeal, a number of lessees of lands within the two forests[8] sought to intervene as necessary and indispensable parties under Fed.R.Civ.P. 19. The lessees also filed motions to vacate, reconsider, or amend the judgment, arguing that the district court had deprived them of due process by adjudicating their property interests without notice and an opportunity to be heard. The district court refused to reopen its judgment but granted the lessees' motion to intervene for the limited purpose of appeal.[9]
 
 
 12
 On appeal, the federal appellants[10] and the lessees argue that both NSO and non-NSO leases were validly sold without the preparation of an EIS because the leases contain restrictions on surface-disturbing activities which protect the environment from significant effects.[11] Additionally, they continue to assert that the limited biological opinions prepared by the FWS satisfied the requirements of the ESA. The lessees separately argue that appellees' action is barred by mootness, estoppel, laches, and the statute of limitations, that the district court abused its discretion by not reopening the case below, that the lessees are necessary and indispensable parties, and that the district court judgment deprived them of property without due process in violation of the Fifth Amendment.
 
 
 13
 We agree with appellants that the district court erred in ruling that the government violated NEPA when it sold NSO leases without preparing an EIS. We agree with the district court, however, that the government violated NEPA when it sold non-NSO leases without an EIS. We further agree with the district court that the government violated the ESA when it sold leases without preparing a comprehensive biological opinion on the effect of oil and gas activities on threatened and endangered species. Finally, we reject the lessees' various arguments collateral to the merits of the NEPA and ESA issues. We therefore affirm in part, reverse in part, and remand with instructions.
 
 II
 THE NEPA ISSUES
 
 14
 Section 102(2)(C) of NEPA requires federal agencies to file an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C); 40 C.F.R. Sec. 1508.11 (1985). If the agency finds, based on a less formal and less rigorous "environmental assessment," that the proposed action will not significantly affect the environment, the agency can issue a Finding of No Significant Impact (FONSI) in lieu of the EIS. 40 C.F.R. Sec. 1508.13 (1985). We will uphold an agency decision that a particular project does not require an EIS unless that decision is unreasonable. Friends of Endangered Species v. Jantzen, 760 F.2d 976, 985 (9th Cir.1985); Foundation for North Am. Wild Sheep v. United States, 681 F.2d 1172, 1177 (9th Cir.1982). The reviewing court must assure, however, that the agency took a "hard look" at the environmental consequences of its decision. Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); California v. Block, 690 F.2d 753, 761 (9th Cir.1982).[12]
 
 
 15
 The purpose of an EIS is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they "retain[ ] a maximum range of options." Sierra Club v. Peterson, 717 F.2d 1409, 1414 (D.C.Cir.1983); see also 40 C.F.R. Secs. 1501.2, 1502.1 (1985); Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir.1985); Environmental Defense Fund v. Andrus, 596 F.2d 848, 852-53 (9th Cir.1979) (EDF v. Andrus ). Toward this end, the courts have attempted to define a "point of commitment" at which the filing of an environmental impact statement is required. Sierra Club v. Peterson, 717 F.2d at 1414. See 40 C.F.R. Sec. 1502.5(a) (1985) (EIS must be prepared at the go/no go stage). Our circuit has held that an EIS must be prepared before any irreversible and irretrievable commitment of resources.[13] EDF v. Andrus, 596 F.2d at 852. Accord Sierra Club v. Peterson, 717 F.2d at 1414 (citing cases). Thus, in this case we must decide whether the sale of any of the oil and gas leases within the two forests constituted an irreversible and irretrievable commitment of federal forest land to surface-disturbing oil and gas activities that could have a significant impact on the environment.
 
 
 16
 In this case the Forest Service gave three justifications for its finding that none of the proposed leases would have a significant impact on the human environment:
 
 
 17
 (a) The Environmental Assessment and the analysis it documents conform with the guidance and management requirements given in the [Gallatin and Flathead National Forest Multiple Use Plans].
 
 
 18
 (b) The resulting action for which this environmental analysis is made will be the granting or denying of leases. This, in and of itself, will have no environmental effect. Surface-disturbing activities that are conducted as a result of granting gas and oil leases will be analyzed on a case-by-case basis, and further environmental analyses will be prepared as required by the National Environmental Policy Act.
 
 
 19
 (c) Appropriate standard and special stipulations will prevent or mitigate much of the adverse environmental impacts from gas and oil activities.
 
 
 20
 Gallatin FONSI at 2 (E.R. at 313); see also Flathead FONSI at 2 (E.R. at 177). Appellants add that, at the very least, the sale of an NSO lease cannot be considered to have a significant effect on the environment because, absent further government approval, the NSO leases absolutely prohibit surface-disturbing activity. We consider the validity of the agency's findings of no significant environmental impact with respect to the NSO leases separately from the validity of its findings with respect to the non-NSO leases.
 
 A. The NSO Leases
 
 21
 For the purposes of this opinion, NSO leases are those leases that absolutely forbid the lessee from occupying or using the surface of the leased land[14] unless a modification of the NSO stipulation is specifically approved by the BLM.[15] Without approval of specific surface-disturbing activity, development of the oil and gas reserves underlying the surface of an NSO lease can only occur through directional (slant) drilling from a parcel not burdened by an NSO stipulation or by well spacing over a large reservoir such that no wells are located on the NSO leasehold. Of approximately 709 leases sold thus far, only 57 are governed by NSO stipulations in their entirety, but around 500 leases contain NSO stipulations covering a portion of the leased property.
 
 
 22
 Appellants argue that the sale of an NSO lease has no effect on the environment, let alone a significant one. They assert that such leases make no commitment of any part of the national forests to surface-disturbing activities by the lessees because the government retains absolute authority to decide whether any such activities will ever take place on the leased lands.[16] The district court disagreed, holding that the issuance of an NSO lease was an irreversible commitment of national forest land. The court reasoned, "The issuance of a lease with an NSO stipulation does not guarantee an EIS before any development would occur. In fact, NSO stipulations can be modified or removed without an EIS." 605 F.Supp. at 109.
 
 
 23
 We disagree with the district court's ruling that the sale of an NSO lease is an irreversible commitment of resources requiring the preparation of an EIS. In ruling that the NSO stipulation could be modified without the preparation of an EIS, the district court evidently relied on a provision in the NSO stipulation which reads: "The [NSO stipulation] may be modified when specifically approved in writing by the District Engineer, Geological Survey with concurrence of the authorized officer of the surface management agency." E.R. at 250. The mere inclusion of such a clause in the lease has no effect, however, on the obligation of the surface management agency to comply with NEPA. Modification or removal of an NSO stipulation would have the same effect as the sale of a non-NSO lease, which, as discussed below, would constitute an irretrievable commitment of resources requiring the preparation of an EIS. Contrary to the assumptions of the district court, NSO provisions cannot be freely altered without an EIS. We cannot assume that government agencies will not comply with their NEPA obligations in later stages of development. Cf. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (agency action entitled to presumption of regularity). Thus, we believe that piecemeal invasion of the forests will be avoided because, as the federal appellants concede, see Brief for the Federal Appellants at 32, government evaluation of surface-disturbing activity on NSO leases must include consideration of the potential for further connected development and cumulative impacts from all oil and gas development activities pursuant to the federal leases. See Thomas v. Peterson, 753 F.2d 754, 757-61 (9th Cir.1985); 40 C.F.R. Secs. 1508.7, 1508.8, 1508.25(a)(1), (2) (1985).
 
 
 24
 We find support for our conclusion in Sierra Club v. Federal Energy Regulatory Commission, 754 F.2d 1506 (9th Cir.1985) (Sierra Club v. FERC ). There, the Federal Energy Regulatory Commission (FERC) granted a "preliminary permit" for the construction and maintenance of hydroelectric facilities on the Tuolumne River in California. The Sierra Club and others challenged FERC's failure to prepare an EIS before granting the permit. We rejected that challenge because the permit gave the applicant no entitlement to conduct any studies on federal land. Id. at 1509-10. Instead, "[t]he sole purpose of the preliminary permit is to maintain the applicant's priority of application for a license," and the applicants can only enter federal land after obtaining Forest Service and BLM special use permits. Id. at 1509.
 
 
 25
 In sum, we hold that the sale of an NSO lease cannot be considered the go/no go point of commitment at which an EIS is required. What the lessee really acquires with an NSO lease is a right of first refusal, a priority right much like the one granted in Sierra Club v. FERC. This does not constitute an irretrievable commitment of resources. Cf. Colorado River Water Conservation District v. United States, 593 F.2d 907, 909-10 (10th Cir.1977) (contract to supply water, contingent upon subsequent preparation of EIS and approval by Secretary of the Interior, does not constitute an irretrievable commitment of resources). Thus, we reverse the district court's judgment as it relates to NSO leases and remand with instructions for the court to determine which leases were NSO leases within the meaning of this opinion. See supra note 15.
 
 B. The Non-NSO Leases
 
 26
 We next consider whether the sale of non-NSO leases without an EIS violates NEPA.[17] The mitigation stipulations in non-NSO leases permit reasonable regulation of surface-disturbing activities to reduce their impact on the environment. These stipulations do not, however, preclude the lessees from engaging in surface-disturbing activities altogether.[18] They may, for example, build roads and drill for oil, subject only to reasonable mitigation measures. Accordingly, we must decide whether the government's right to regulate, rather than preclude, surface-disturbing activities protects the forest environment from significant adverse effects, obviating the need for an EIS at the lease sale stage.
 
 
 27
 The identical question was decided by the District of Columbia Circuit in Sierra Club v. Peterson, 717 F.2d 1409, 1412-15 (D.C.Cir.1983). In that case, the government sold oil and gas leases on lands within the Targhee and Bridger-Teton National Forests of Idaho and Wyoming without first preparing an EIS. All leases contained standard and special mitigation stipulations for the protection of the environment, many of which were identical to the stipulations used in this case. Sierra Club v. Peterson, 717 F.2d at 1411 & nn. 4 & 5.[19] Standard stipulations provide that any surface-disturbing activity on the leases is conditional on compliance with additional NEPA analysis, including an EIS if appropriate. Special stipulations provide for the protection of particularly sensitive areas through various restrictions as to (1) timing of surface occupancy (to prevent human activity during critical periods in animal lifecycles), (2) frequency of road use (to minimize human/animal contact), or (3) location of surface activity (to avoid activity near recreation areas, steep slopes, unstable soils, or occupied wildlife habitat). The Forest Service may also require that operators mitigate detrimental effects on the environment through relocation, testing, and salvage. Thus, in Sierra Club v. Peterson, the Forest Service was able to condition its approval of surface-disturbing activity on the timing, coordination, and extent of exploratory drilling and other post-leasing operations. The District of Columbia Circuit concluded, however, that "[o]n land leased without a No Surface Occupancy Stipulation the Department cannot deny the permit to drill; it can only impose 'reasonable' conditions which are designed to mitigate the environmental impacts of the drilling operations." 717 F.2d at 1411; cf. EDF v. Andrus, 596 F.2d at 852 (Interior Department cannot execute water option contracts without preparing an EIS because once granted, the contracts prohibit government from "unilaterally changing its mind.").
 
 
 28
 The District of Columbia Circuit found the distinction between the NSO and non-NSO leases critical. Even though the standard and special mitigation stipulations provided a modicum of protection for the environment, the court held that the sale of non-NSO leases entailed an irrevocable commitment of land to significant surface-disturbing activities, including drilling and roadbuilding, and that such a commitment could not be made under NEPA without an EIS. 717 F.2d at 1414-15.
 
 
 29
 We agree with the conclusions of the District of Columbia Circuit in Sierra Club v. Peterson. As in that case, the non-NSO leases in our case do not reserve to the government the absolute right to prevent all surface-disturbing activity. Indeed, one of the mitigation stipulations used both here and in Sierra Club v. Peterson specifically limits government control over post-leasing activities to reasonable regulations which are consistent with oil and gas development and production:
 
 
 30
 Notwithstanding any provision of this lease to the contrary, any drilling, construction, or other operation on the leased lands that will disturb the surface thereof or otherwise affect the environment ... conducted by lessee shall be subject, as set forth in this stipulation, to prior approval of such operation by the Area Oil and Gas Supervisor ... and to such reasonable conditions, not inconsistent with the purposes for which this lease is issued, as the Supervisor may require to protect the surface of the leased lands and the environment.
 
 
 31
 Flathead EA at 68 (Appendix E) (BLM Surface Disturbance Stipulations, Form 3109-5) (E.R. at 246) (emphasis added); see also Sierra Club v. Peterson, 717 F.2d at 1411 n. 4. (" 'standard' stipulations include Stipulation for lands under jurisdiction of the Department of Agriculture, 3109-3 ..., the Surface Disturbance Stipulation, 3109-5 ..., and the Forest Service Supplement to Form 3109-3...."). Because the purpose of the leases sold in the Flathead and Gallatin National Forests is oil and gas exploration, development, and production, it would clearly be inconsistent with the purpose of the leases if the government prevented all drilling, roadbuilding, pipe-laying, and other lease-related surface-disturbing activities.[20] Yet it is also clear that those activities are likely, if not certain, to significantly affect the environment. As the Flathead EA specifically notes, "It is generally acknowledged that in areas where substantial oil and gas reserves are discovered, the effects of development and production become broad in extent." Flathead EA at 8 (E.R. at 188).
 
 
 32
 We are unpersuaded by appellants' argument that the mitigation measures reduce the effects of even oil and gas exploration, development, and production activities to environmental insignificance. We understand that the mitigation stipulations enable the government to regulate many of the adverse environmental impacts of oil and gas activities. We seriously question, however, whether the ability to subject such highly intrusive activities to reasonable regulation can reduce their effects to insignificance. NEPA does not require that mitigation measures completely compensate for the adverse environmental effects of post-leasing oil and gas activities, see Friends of Endangered Species v. Jantzen, 760 F.2d 976, 987 (9th Cir.1985), but an EIS must be prepared as long as "substantial questions" remain as to whether the measures will completely preclude significant environmental effects. Friends of the Earth v. Hintz, 800 F.2d 822, 836 (9th Cir.1986); Foundation for North Am. Wild Sheep v. United States, 681 F.2d 1172, 1180-81 (9th Cir.1982). Thus, even if there is a chance that regulation of surface-disturbing activities will render insignificant the impacts of those activities, that possibility does not dispel substantial questions regarding the government's ability to adequately regulate activities which it cannot absolutely preclude. In sum, we agree with the district court that the government violated NEPA by selling non-NSO leases without preparing an EIS.
 
 
 33
 Appellants also complain that the uncertain and speculative nature of oil exploration[21] makes preparation of an EIS untenable until lessees present precise, site-specific proposals for development.[22] The government's inability to fully ascertain the precise extent of the effects of mineral leasing in a national forest is not, however, a justification for failing to estimate what those effects might be before irrevocably committing to the activity. Cf. EDF v. Andrus, 596 F.2d at 851 (uncertainty about environmental impact of use of water diverted pursuant to option contract "does not obviate the importance of the decision to divert and the necessity to evaluate the environmental consequences of that decision"). Appellants' suggestion that we approve now and ask questions later is precisely the type of environmentally blind decision-making NEPA was designed to avoid.
 
 
 34
 Moreover, we agree with the District of Columbia Circuit in Sierra Club v. Peterson that the option of selling NSO leases rather than non-NSO leases provides a reasonable alternative approach for oil and gas leasing in the face of uncertainty:
 
 
 35
 If ... the Department is in fact concerned that it cannot foresee and evaluate the environmental consequences of leasing without site-specific proposals, then it may delay preparation of an EIS provided that it reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable. If the Department chooses not to retain the authority to preclude all surface disturbing activities, then an EIS assessing the full environmental consequences of leasing must be prepared at the point of commitment--when the leases are issued. The Department can decide, in the first instance, by which route it will proceed.
 
 717 F.2d at 1415.[23]
 
 36
 In sum, the sale of a non-NSO oil or gas lease constitutes the "point of commitment;" after the lease is sold the government no longer has the ability to prohibit potentially significant inroads on the environment. By relinquishing the "no action" alternative without the preparation of an EIS, the government subverts NEPA's goal of insuring that federal agencies infuse in project planning a thorough consideration of environmental values. The "heart" of the EIS--the consideration of reasonable alternatives to the proposed action--requires federal agencies to consider seriously the "no action" alternative before approving a project with significant environmental effects. 40 C.F.R. Sec. 1502.14(d) (1985). That analysis would serve no purpose if at the time the EIS is finally prepared, the option is no longer available. We agree with the District of Columbia Circuit that unless surface-disturbing activities may be absolutely precluded, the government must complete an EIS before it makes an irretrievable commitment of resources by selling non-NSO leases. See Sierra Club v. Peterson, 717 F.2d at 1412-15; see also Cady v. Morton, 527 F.2d 786, 793-95 (9th Cir.1975) (EIS required for decision to issue coal leases); Dept. of the Interior, 516 Dept.Manual 4.3A, promulgated at 45 Fed.Reg. 27,541, 27,546 (1980) ("The feasability analysis (go/no-go) state, at which time an EIS is to be completed, is to be interpreted as the stage prior to the first point of major commitment to the proposal. For example, this would normally be at ... the leasing stage for mineral resource proposals."); cf. South Dakota v. Andrus, 614 F.2d 1190, 1194-95 (8th Cir.1980) (issuance of mineral patent not a major federal action, because unlike a lease, mineral patent not a precondition to initiation of mining operations). We therefore affirm the district court's ruling on the NEPA issues with respect to those leases which, on remand, it determines are not NSO leases within the meaning of this opinion.
 
 III
 THE ENDANGERED SPECIES ACT ISSUES
 
 37
 Section 7(a)(2) of the ESA, 16 U.S.C. Sec. 1536(a)(2), requires the Secretary of the Interior to ensure that an action of a federal agency is not likely to jeopardize the continued existence[24] of any threatened or endangered species.[25] Section 7(b) sets out a process of consultation whereby the agency with jurisdiction over the protected species issues to the Secretary a "biological opinion" evaluating the nature and extent of jeopardy posed to that species by the agency action. 16 U.S.C. Sec. 1536(b). The agency proposing the action (action agency) must provide the Secretary with "the best scientific and commercial data available." 16 U.S.C. Sec. 1536(a)(2). If the biological opinion concludes that the proposed action is likely to jeopardize a protected species, the action agency must modify its proposal.[26] In addition, section 7(d) forbids "irreversible or irretrievable commitment of resources" during the consultation process.[27]
 
 
 38
 In this case, the ESA consultation process was triggered when the Forest Service notified the Secretary that the sale of oil and gas leases in the Flathead and Gallatin National Forests, proposed pursuant to the Mineral Leasing Act of 1920 (MLA), 30 U.S.C. Sec. 181 et seq., might affect threatened and endangered species living there, including the grizzly bear, the bald eagle, the peregrine falcon, and the gray wolf.[28] The Secretary, through the FWS,[29] issued biological opinions assessing the environmental effects of the lease sales. The FWS divided the oil and gas activities into stages and addressed the effects of only the leasing stage, concluding that there was "insufficient information available to render a comprehensive biological opinion beyond the initial lease phase." Gallatin Biological Opinion at D2-3 (E.R. at 396-97); see also Flathead Biological Opinion at 92 (E.R. at 273). Thus, the biological opinions of the FWS, which concluded that leasing itself was not likely to jeopardize the protected species, did not assess the potential impact that post-leasing oil and gas activities might have on protected species. Rather the FWS opinions relied on "incremental-step consultation," contemplating that additional biological evaluations would be prepared prior to all subsequent activities and that lessees' development proposals would be modified to protect species: "[A]dditional consultation will be required for each of the subsequent phases of oil and gas activities." Gallatin Biological Opinion at D3 (E.R. at 397); see also Flathead Biological Opinion at 91-92 (E.R. at 272-73).
 
 
 39
 The district court rejected the biological opinions because they were limited to the lease sale stage, holding that the FWS "violated ESA by failing to analyze the consequences of all stages of oil and gas activity on the forests." Conner v. Burford, 605 F.Supp. at 109. Appellants had argued that various lease stipulations protected the species by allowing for intervention if subsequent oil and gas activities, such as development and production, should threaten to jeopardize species' continued existence. By indicating that the lease issuance could proceed only on the basis of a "comprehensive" biological opinion which considered not only the leasing stage but leasing and all post-leasing activities, the district court effectively held that incremental-step consultation violates the ESA.
 
 
 40
 Reviewing de novo the district court's grant of summary judgment, we will not reverse the FWS' decision to limit the biological opinion to the lease sale stage unless that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Friends of Endangered Species v. Jantzen, 760 F.2d 976, 981-82 (9th Cir.1985). On this record, we agree with the district court that the FWS' decision was not in accordance with the law.
 
 
 41
 A. The Limited Scope of the Biological Opinions
 
 
 42
 The parties agree that before any leases could be sold, the FWS was required to prepare a biological opinion. See, e.g. Thomas v. Peterson, 753 F.2d 754, 763 (9th Cir.1985) (Forest Service's failure to prepare biological assessment prior to decision to build road violated ESA). The ESA requires that the biological opinion detail "how the agency action affects the species or its critical habitat." 16 U.S.C. Sec. 1536(b)(3)(A) (emphasis added). Thus, the scope of the agency action is crucial because the ESA requires the biological opinion to analyze the effect of the entire agency action. North Slope Borough v. Andrus, 642 F.2d 589, 608 (D.C.Cir.1980), aff'g in part, rev'g in part, 486 F.Supp. 332 (D.D.C.1980) (legal adequacy of a 'biological opinion' tested by matching the meaning of 'agency action' with a legal definition of term). We interpret the term "agency action" broadly. TVA v. Hill, 437 U.S. 153, 173 & n. 18, 98 S.Ct. 2279, 2291 & n. 18, 57 L.Ed.2d 117 (1978). As the District of Columbia Circuit has noted, "[c]aution can only be exercised if the agency takes a look at all the possible ramifications of the agency action." North Slope, 642 F.2d at 608 (quoting North Slope, 486 F.Supp. at 351).
 
 
 43
 In North Slope, which involved an offshore oil lease sale under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. Sec. 1331 et seq., the District of Columbia Circuit held that the "agency action" encompassed the entire leasing project, from the issuance of the leases through post-leasing development and production: " '[P]umping oil' and not 'leasing tracts' is the aim of congressional [mineral leasing] policy." North Slope, 642 F.2d at 608. Following the District of Columbia Circuit, we hold that agency action in this case entails not only leasing but leasing and all post-leasing activities through production and abandonment. Thus, section 7 of the ESA on its face requires the FWS in this case to consider all phases of the agency action, which includes post-leasing activities, in its biological opinion. Therefore the FWS was required to prepare, at the leasing stage, a comprehensive biological opinion based on "the best scientific and commercial data available." 16 U.S.C. Sec. 1536(a)(2).
 
 
 44
 Both the Flathead and Gallatin biological opinions pay lip service to this statutory duty. Each contains the statement that the "action" being considered "includes not just final lease issuance but all resulting subsequent activities." Gallatin Biological Opinion at D3 (E.R. at 397); see also Flathead Biological Evaluation at 82 (E.R. at 260). However, as noted above, both biological opinions concluded that there was insufficient information pertaining to the specific location and extent of post-leasing oil and gas activities to render a comprehensive biological opinion beyond the initial lease stage.
 
 
 45
 Appellees argue that the FWS failed to prepare biological opinions based on the best data available. We agree. The FWS took the position that there was insufficient information on post-leasing activities to prepare comprehensive biological opinions. Although we recognize that the precise location and extent of future oil and gas activities were unknown at the time, extensive information about the behavior and habitat of the species in the areas covered by the leases was available. For example, appellees point out that three-fourths of the area studied in the forests had been designated "essential" or "occupied" habitat for protected species. See Appellees' Exhibit 11. Indeed, the environmental assessments prepared by the Forest Service contained detailed information on the behavior and habitats of the species, and discussed the likely impact of various stages of oil and gas activities. See Threatened and Endangered Species Biological Evaluation (Flathead EA, Appendix G) (E.R. at 260-87); Biological Evaluation (Gallatin EA, Appendix B) (E.R. at 311-95); see also Gallatin Biological Opinion at D7 (E.R. at 401).
 
 
 46
 We agree with appellees that incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available. 16 U.S.C. Sec. 1536(a)(2). With the post-leasing and biological information that was available, the FWS could have determined whether post-leasing activities in particular areas were fundamentally incompatible with the continued existence of the species. Indeed, by recommending the exclusion of areas where leasing would conflict with the conservation of protected species, the FWS implicitly admitted that even minimal exploration and development would be incompatible with the conservation of the species in some areas that can be identified before any agency action is taken.[30] Gallatin Biological Opinion at D7 (E.R. at 401). With the information available, the FWS could also have identified potential conflicts between the protected species and post-leasing activities due to the cumulative impact of oil and gas activities. For example, species like the grizzly and the gray wolf require large home ranges making it critical that ESA review occur early in the process to avoid piecemeal chipping away of habitat. See id.
 
 
 47
 Furthermore, although the FWS justified the decision to delay completing comprehensive biological opinions on the inexact information about post-leasing activities. Congress, in enacting the ESA, did not create an exception to the statutory requirement of a comprehensive biological opinion on that basis. The First Circuit, for example, has recognized that the Secretary may be required to make projections, based on potential locations and levels oil and gas activity, of the impact of production on protected species. See Roosevelt Campobello Int'l Park Comm'n v. EPA, 684 F.2d 1041, 1052-55 (1st Cir.1982) (EPA must prepare "real time simulation" studies of low risk oil spills despite the fact that study will only produce informed estimate of potential environmental effects).
 
 
 48
 In light of the ESA requirement that the agencies use the best scientific and commercial data available to insure that protected species are not jeopardized, 16 U.S.C. Sec. 1536(a)(2), the FWS cannot ignore available biological information or fail to develop projections of oil and gas activities which may indicate potential conflicts between development and the preservation of protected species. We hold that the FWS violated the ESA by failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action. To hold otherwise would eviscerate Congress' intent to "give the benefit of the doubt to the species."[31]
 
 
 49
 B. Incremental-Step Consultation as a Substitute for
 
 Comprehensive Biological Opinions
 
 50
 Appellants argue that the ESA's mandate to protect species is satisfied without a comprehensive biological opinion if an incremental-step consultation process is written into the leases. Specifically, appellants argue that the requirements of the ESA are satisfied by Threatened and Endangered Species (T & E) stipulations contained in each lease which provide:
 
 
 51
 The Federal surface management agency is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species, listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.[32]
 
 
 52
 Appellants reason that the T & E stipulations ensure that there will be adequate environmental review prior to the initiation of any activity which might jeopardize protected species.[33] They argue that since the T & E stipulations reserve to the government the authority to absolutely preclude any activity likely to jeopardize a species, the need for a comprehensive biological opinion at the initial lease phase is obviated.
 
 
 53
 Appellants ask us, in essence, to carve out a judicial exception to ESA's clear mandate that a comprehensive biological opinion--in this case one addressing the effects of leasing and all post-leasing activities--be completed before initiation of the agency action. They would have us read into the ESA language to the effect that a federal agency may be excused from this requirement if, in its judgment, there is insufficient information available to complete a comprehensive opinion and it takes upon itself incremental-step consultation such as that embodied in the T & E stipulations.[34] We reject this invitation to amend the ESA. That it is the role of Congress, not the courts.
 
 
 54
 Appellants argue that their position--that an incremental-step consultation process is consistent with the ESA--is supported by North Slope. 642 F.2d 589. However, we read North Slope as supporting our view that incremental-step consultation does not vitiate the ESA requirement that the Secretary prepare a comprehensive biological opinion. As noted above, the District of Columbia Circuit recognized that the ESA on its face requires that a biological opinion consider the entire agency action and stressed that OCSLA "does not attenuate ESA's notion of 'agency action.' " Id. at 609. The court wrestled with the apparent tension between the ESA, which requires that the entire agency action be considered in a biological opinion, and OCSLA, which provides for a segmented approach to offshore oil projects. It concluded that the two statutes were ultimately complementary because the segmented approach of OCSLA, which requires the Secretary to examine the effect of proposed oil leasing, exploration and drilling prior to their separate initiation, ensures "graduated compliance with environmental and endangered life standards." 642 F.2d at 609; see also Conservation Law Foundation v. Andrus, 623 F.2d 712 (1st Cir.1979). In reaching this conclusion, the court explicitly relied on the OCSLA system of "checks and balances." 642 F.2d at 609. As the Supreme Court later noted, these "checks and balances" include careful review by the Secretary of the Interior of all activity carried out pursuant to OCSLA and "specific requirements for consultation with Congress, between federal agencies, or with the States" at every stage. See Secretary of Interior v. California, 464 U.S. 312, 337, 104 S.Ct. 656, 669, 78 L.Ed.2d 496 (1984).[35] These procedural guarantees led the District of Columbia Circuit to conclude that the segmented approach of OCSLA mitigated the ESA requirement that the biological opinion address all phases of the mineral leasing project.
 
 
 55
 Similarly, appellants also rely on Village of False Pass v. Clark, 733 F.2d 605, 609-12 (9th Cir.1984), aff'g, 565 F.Supp. 1123 (D. Alaska 1983) (False Pass ), another case involving the proposed sale of oil leases under OCSLA, to support their contention that the FWS is not required to prepare comprehensive biological opinions in this case involving lease sales under the MLA. In False Pass, although we acknowledged that "agency action" is broadly construed under the ESA, we concluded that the agency action at issue was limited to the sale of leases. Id. at 611. We stressed that the Secretary was obligated to comply with the ESA at each stage of development, id. at 611 (citing Conservation Law Foundation v. Andrus, 623 F.2d 712, 715 (1st Cir.1979)), and that the regulations promulgated, in part under OCSLA, made the Secretary's plan to assess the impact on marine life prior to each stage of oil development "a real safeguard." Id. at 612. We concluded that the requirements of the ESA were satisfied by a biological opinion that was limited to the lease sale and exploration stages.[36] Thus in False Pass, as in North Slope, we accepted a limited biological opinion on the basis of the complementary relationship between the ESA's requirements and the segmented approach of OCSLA. However, False Pass cannot be interpreted as authority that Congress intended to create an across-the-board exception to the ESA's biological opinion requirement.
 
 
 56
 Appellants argue that North Slope and False Pass are authority for using a similar segmented approach, "incremental-step consultation," with respect to oil and gas leases issued under the MLA.[37] The MLA, however, contains no system of "checks and balances" similar to OCSLA's. Thus there is no tension between the MLA and the ESA and hence we find no justification to obviate the ESA's congressional mandate[38] that a comprehensive biological opinion be prepared in this case. We reject both North Slope and False Pass as controlling authority on this issue.[39]
 
 
 57
 Finally, appellants rely on Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678 (D.C.Cir.1982), a non-OCSLA case involving copper and silver exploration in a Montana wilderness area, for the proposition that biological opinions assessing onshore mineral development may be limited to the leasing stage. In Cabinet Mountains Wilderness, however, the agency action at issue was limited to the Forest Service's approval of a four-year exploratory drilling proposal. In that case the FWS' biological opinion detailed the effects of the four-year program and thus considered the effect of the entire agency action. Id. at 680. The District of Columbia Circuit specifically emphasized that "our review of the agency's action is limited to approval of the four-year exploratory drilling proposal.... Any future proposals ... to conduct drilling activities in the Cabinet Mountains area will require further scrutiny under ... the ESA." Id. at 687. Hence Cabinet Mountains Wilderness does not support appellants' contention that the ESA is satisfied by a biological opinion which addresses only a portion of the agency action at issue.
 
 
 58
 We conclude that the ESA does not permit the incremental-step approach under the MLA advocated by appellants. The biological opinions must be coextensive with the agency action and T & E stipulations cannot be substituted for comprehensive biological opinions.[40] We therefore hold in this case that before further leasing occurs in the Flathead and Gallatin National Forests and before any further surface-disturbing activities occur on the lands already leased, the FWS must prepare biological opinions assessing the potential impacts of all post-leasing activities.[41]
 
 IV
 THE RULE 19 ISSUES
 
 59
 After judgment was entered below, a number of lessees attempted to intervene as necessary and indispensable parties. They also filed motions to vacate, reconsider, or amend the judgment, arguing that the district court had violated Fed.R.Civ.P. 19 and the due process clause of the Fifth Amendment by adjudicating their property interests without notice and an opportunity to be heard. In addition, they argued that the appellees' action was moot and barred by estoppel, laches, and the statute of limitations. In light of the lessees' delay in attempting to join litigation that had been filed two years earlier, the district court refused to reopen the judgment to consider the lessees' arguments. The district court did, however, permit intervention for the purposes of appeal so that the lessees could press their arguments before this court.
 
 
 60
 The heart of the lessees' collateral arguments is their contention that all lessees were indispensable to the action below. They argue that without first joining the lessees, the district court should not have, "in equity and good conscience," proceeded to a judgment setting aside the agency actions allowing the issuance of oil and gas leases.[42] Appellees do not challenge the lessees' assertion that mineral leaseholders in the two forests would ordinarily be considered persons to be joined if joinder is feasible (necessary parties).[43] Rather they contend that their suit falls within the "public rights" exception to traditional joinder rules and that the lessees therefore are not indispensable parties.
 
 
 61
 The Supreme Court enunciated the public rights exception in National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940), declaring, "In a proceeding ... narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." Id. at 363, 60 S.Ct. at 577 (emphasis added). In National Licorice, the National Labor Relations Board (NLRB) had set aside, as a violation of the National Labor Relations Act (NLRA), contracts that the National Licorice Company had procured from its employees by means of unfair labor practices. Id. at 356, 60 S.Ct. at 573. The company challenged the authority of the NLRB to enter such an order in the absence of the employees, arguing in essence that they were indispensable because they were parties to the contracts.
 
 
 62
 The Supreme Court disagreed. Comparing the NLRB action to suits brought under the Sherman Act, the Court noted that antitrust injunctions often affect nonparties by preventing the offending company from meeting contractual obligations to others not before the court. Id. at 365, 60 S.Ct. at 578. Similarly, the Court reasoned, the Federal Trade Commission often enters orders restraining unfair methods of competition that preclude the offender from performance of outstanding contracts. In either case, "the public right [is] vindicated by restraining the unlawful actions of the defendant even though the restraint prevent[s] his performance of the contracts." Id. at 366, 60 S.Ct. at 578. The Court felt that this burden on the contractual rights of nonparties was acceptable, however, because such adjudications do not destroy the legal entitlements of the absent parties: "In every case the third persons were left free to assert such legal rights as they might have acquired under their contracts." Id. at 366, 60 S.Ct. at 578.
 
 
 63
 In National Licorice itself, the public rights at stake were the policy objectives of the NLRA. To require joinder of employees covered by labor contracts obtained through unfair labor practices would effectively undermine the ability of the NLRB to enforce the NLRA.[44] Instead, the NLRB issued an order "directed solely to the employer" which was "ineffective to determine any private rights of the employees and leaves them free to assert such legal rights as they may have acquired under their contracts, in any appropriate tribunal...." Id. at 366, 60 S.Ct. at 578. Because the third parties' interest in the litigation was thus severable from the particular public rights at issue, the Supreme Court refused to burden the NLRB as the party seeking to enforce public policy with the requirement of joining the individual employees, even though their interests might be affected by the judgment.[45]
 
 
 64
 Subsequent courts have also refused to require the joinder of all parties affected by public rights litigation--even when those affected parties have property interests at stake--because of the tight constraints traditional joinder rules would place on litigation against the government. See, e.g., Jeffries v. Georgia Residential Finance Authority, 678 F.2d 919, 927-29 (11th Cir.1982) (Section 8 landlords not joined in action by tenants challenging lease termination procedure); Swomley v. Watt, 526 F.Supp. 1271, 1273 (D.D.C.1981) (owners of use permit for federal lands not joined in Establishment Clause challenge to issuance of permit); National Resources Defense Council v. Berklund, 458 F.Supp. 925, 933 (D.D.C.1978) (refusal to join applicants for preference right coal leases in NEPA challenge to lease sale), affirmed, 609 F.2d 553 (D.C.Cir.1980); National Resources Defense Council v. Tennessee Valley Authority 340 F.Supp. 400, 407-08 (refusal to join coal producers in action challenging TVA's coal purchases under NEPA) (NRDC v. TVA ); National Wildlife Federation v. Burford, 676 F.Supp. 271 (D.D.C.1985) (mineral leaseholders not joined in challenge to lifting of protective restrictions on federal land).
 
 
 65
 Kirkland v. New York State Dept. of Correctional Services, 520 F.2d 420 (2d Cir.1975), in particular, illustrates the potential danger of expanding joinder requirements in the public rights area. In that case, a class of black corrections officers challenged the constitutionality of a civil service examination used for the determination of promotions in the New York State Department of Corrections. Although 30.8% of the white officers taking the test passed, only 7.7% of the blacks also passed. Id. at 422. Midway through the trial, a group of white officers who had passed the examination attempted to intervene, arguing that they were indispensable parties. The district court permitted intervention but precluded the relitigation of matters already considered by the court. Upon conclusion of the trial, the court entered an order declaring the examination unconstitutional and enjoining the department from making appointments as a result thereof. On appeal, the Second Circuit admitted that because the district court injunction kept the intervenors from being promoted, these officers had an interest in the litigation that was adversely affected. The court rejected the intervenors' argument that they were indispensable parties, however, citing to National Licorice. Id. at 424.[46] Clearly, to have found the intervenors indispensable in that situation would have sounded the death knell for any judicial review of executive decisionmaking.
 
 
 66
 Like the cases cited above, this case is amenable to the application of the National Licorice public rights doctrine.[47] The appellees' litigation against the government does not purport to adjudicate the rights of current lessees; it merely seeks to enforce the public right to administrative compliance with the environmental protection standards of NEPA and the ESA. The lessees argue strongly, however, that the public rights doctrine cannot apply here, since they claim that the district court destroyed their property rights in their absence by setting aside the leases.
 
 
 67
 As a factual matter, it is not clear that the district court actually intended to set aside the leases.[48] Nor do appellees urge such an interpretation of the order. They specifically note that "[t]he contracts themselves were not invalidated and further actions construing rights under them are not precluded by the district court's order." Brief for Plaintiff-Appellees at 36. Whether or not this is a correct interpretation of the district court's intent, we now clarify the order to assure that it has that effect.[49] As other courts also have done in similar situations, we hereby enjoin the federal defendants from permitting any surface-disturbing activity to occur on any of the leases until they have fully complied with NEPA and ESA. See, e.g., Northern Alaska Environmental Center v. Hodel, 803 F.2d 466 (9th Cir.1986); see also Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir.1985) (injunction appropriate remedy for violation of NEPA) (citing cases). Moreover, any future environmental analysis by the federal agencies shall not take into consideration the commitments embodied in the non-NSO leases already sold.
 
 
 68
 The order as modified does not adjudicate or "prejudge" the rights of the lessees against the government.[50] Cf. National Licorice, 309 U.S. at 365, 60 S.Ct. at 578 (NLRB order "does not foreclose the employees from taking any action to secure an adjudication upon the contracts, nor prejudge their rights in the event of such adjudication."). We enjoin only the actions of the government; the lessees remain free to assert whatever claims they may have against the government.[51] Thus, the public right to compliance with environmental standards is vindicated with a minimum imposition on the rights of lessees. The order as modified will obviously preclude immediate government approval of surface-disturbing activity, but such foreclosure of the lessees' ability to get "specific performance" until the government complies with NEPA and the ESA is insufficient to make the lessees indispensable to this litigation. See NRDC v. TVA, 340 F.Supp. at 408. By essentially creating NSO leases out of non-NSO leases, we retain in the leaseholders many of the fundamental attributes of their contracts. As strenuously argued by both the government and the lessees, significant economic value inheres in the exclusive right to engage in oil and gas activities, should any be allowed. Once the government complies with NEPA and the ESA, it is entirely possible that it will authorize surface-disturbing activities on many of the leased tracts. Thus, although development probably will be delayed, it is conceivable that it will occur on some of the leases already sold. The legally protected interests of the lessees are barely affected until the government decides that no development and production of the oil and gas reserves will be allowed, and even then they may have claims for damages against the government.
 
 
 69
 Finally, the lessees have robustly represented the interests of the entire lessee class on appeal. Although they are foreclosed from adding to the record on appeal, the evidence they have proffered is mainly cumulative of evidence already considered by the district court. For example, the lessees proffer evidence on the effectiveness of the mitigation stipulations in preventing environmental damage during post-leasing activities. There is, however, an abundance of evidence in the administrative record on the effectiveness of the mitigation stipulations, and the lessees offer nothing in their motions to intervene that would undermine our conclusion that the sale of leases without an NSO stipulation was a commitment of the land to development. The lessees also offer affidavits to show that they had no notice of the litigation until after judgment was entered, but that evidence was presented to the district court, which still found the lessees' delay in intervening inexcusable. Last, the lessees proffer evidence of the specific damages they will suffer if they are forbidden from disturbing the land they have leased. As the nature of the damage is self-evident, details of specific injuries are unnecessary to our disposition.
 
 
 70
 As far as the substantive issues under NEPA and the ESA are concerned, we find that the absent lessees were adequately represented by the government below. The government vigorously defended its leasing decisions under both NEPA and the ESA, and the district court was not required to reopen the case only to rehash old evidence. See Kirkland, 520 F.2d at 423-24 (approving district court's decision to limit late intervention to matters not already litigated). The other claims raised by the lessees are meritless. Appellees were clearly diligent in prosecuting this litigation, so laches does not apply. See Preservation Coalition v. Pierce, 667 F.2d 851, 854 (9th Cir.1982) (noting the "sparing" invocation of laches in environmental cases). To find appellees' claims moot, we would have to hold that no injunction can issue which affects the leases already issued; we have declined to so rule above. Similarly, we would only reach the statute of limitations and estoppel questions were we to hold, which we do not, that the lessees must be joined in this action.
 
 CONCLUSION
 
 71
 The federal agencies violated NEPA by issuing non-NSO leases without preparing an EIS. They violated the ESA by making lease sales without preparing a biological opinion which considers the effects of post-leasing oil and gas activities. Accordingly, the agencies are enjoined from allowing any surface-disturbing activity on the lands already leased and from selling any more leases in the Flathead and Gallatin National Forests until they comply with NEPA and the ESA.
 
 
 72
 We hereby AFFIRM the judgment in part, REVERSE in part, and REMAND with instructions that the district court determine which leases are NSO leases within the meaning of this opinion.
 
 
 73
 Costs are awarded to appellees.
 
 
 74
 WALLACE, Circuit Judge, concurring in part and dissenting in part:
 
 
 75
 The factual and procedural description in part I is adequate for our decision and I concur in parts II and IV. I dissent from part III.
 
 
 76
 In part III, the majority concludes that the federal agencies involved here violated the Endangered Species Act of 1973 (ESA), 16 U.S.C. Sec. 1531-43, when they leased national forest lands pursuant to a biological opinion which considered only the leasing stage itself. To reach this conclusion, the majority must attempt to distinguish our opinion in Village of False Pass v. Clark, 733 F.2d 605 (9th Cir.1984) (False Pass ). The majority's effort clearly fails. Because we are required to follow our own precedent, I dissent from the majority's holding in part III. False Pass controls this case and it mandates the result opposite to the one the majority reaches.
 
 
 77
 The majority cannot brush aside False Pass. In False Pass, we held that the Secretary of the Interior did not violate the ESA when he limited his biological opinion to the lease sale stage in offering leases under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. Sec. 1331-56. The majority attempts to distinguish False Pass on the grounds that False Pass involved leases under the OCSLA but the case before us does not. I can accept neither this attempt to distinguish False Pass nor the majority's contention that we should interpret False Pass to apply only to cases involving the OCSLA. An objective reading demonstrates that the determinative factor in False Pass was that the proposed plan of resource exploitation was segmented in such a way as to require agency approval prior to the commencement of each new stage of development. We stressed that the stages, as established by the OCSLA, were "separate and distinct" and would each involve separate review, False Pass, 733 F.2d at 608, and that the agency could put a halt to further developer action prior to each successive stage of the process, id. at 611. We held that the biological opinion therefore need only encompass the particular stage that the agency then contemplated approving because, in view of the segmented development scheme, "[t]he lease sale decision itself could not directly place [the endangered species] in jeopardy." Id. If any future stage of development turned out to pose a threat to the endangered species, then the segmented scheme provided a mechanism for the agency to put a stop to further development, and the ESA mandated that the agency employ this mechanism to do so. Id. at 608-12.
 
 
 78
 The development scheme contemplated in the leases in this appeal creates, as a practical matter, at least two similarly distinct stages. Notwithstanding the majority's contention in footnote 39, the leases contain a "Threatened and Endangered Species" stipulation that permits the agency to put a complete stop to any project prior to or after the commencement of any surface-disturbing activities if it finds that such activities would have a deleterious effect on an endangered species. See maj. op. at 1535 (quoting the stipulation). As a result of this stipulation, as the Fish & Wildlife Service observed, holders of leased tracts may still "have no opportunity for surface occupancy due to irresolvable conflicts with wildlife resources." Gallatin Biological Opinion, ER 400. In other words, all that the agency has done in selling the "leases" is conveyed priorities in submitting plans for development of these tracts; it has not obligated itself to approve any of these plans. As such, the leasing stage under the terms of the leases before us is as discrete a stage as that mandated by the OCSLA. See Secretary of Interior v. California, 464 U.S. 312, 339, 104 S.Ct. 656, 670, 78 L.Ed.2d 496 (1984).
 
 
 79
 The ESA still obligates the agency to perform appropriate biological studies before a leaseholder can engage in any surface-disturbing activities at all on the tracts. As the majority reminds us, "[w]e cannot assume that government agencies will not comply" with the law. See maj. op. at 1528-29. Yet this position, which I also adopt, stands in stark contrast to the assumption apparently made by the majority that the agency will let the fact that the lessee expended substantial sums of money in preparing to exploit its lease pressure it into acting illegally by failing to live up to the mandate of the ESA. The lessees, after all, bear the potential risk of financial loss, as the terms of the leases obviously made them aware. The agency has irrevocably promised nothing beyond a right of first refusal.
 
 
 80
 Despite the existence of discrete stages, the majority seeks to argue that I am giving an "expansive reading" to False Pass and that False Pass does not control here because the application of that case is limited to cases involving leases under the OCSLA. Maj. op. at 1537 n. 39. The majority cites nothing from our False Pass opinion to support this proposition, and I find nothing that would lead me to believe it to be true. In fact, an objective reading would, I suggest, lead to an opposite conclusion. In False Pass it was the Secretary's "plan" for ensuring compliance with the ESA at each successive stage that we found "insure[d] that the many agency actions that may follow indirectly from the [lease] sale w[ould] not [place endangered species in jeopardy]." False Pass, 733 F.2d at 611. We did not say that it was the OCSLA that provided this insurance. In fact, in examining the "plan" involved in False Pass, we looked not only to the legal requirements of the OCSLA, but to two other elements as well: (1) the special disclaimers that the Secretary placed in the Final Notices of Sale to permit him to order cessation of exploratory drilling when it threatened the endangered whales, and (2) the Secretary's own relevant regulations, only a portion of which had been promulgated under the OCSLA. Id. at 611-12. I therefore cannot accept the majority's conclusion that it was the mere presence of the OCSLA, rather than the nature of the development plan it created, that was determinative in False Pass. See maj. op. at 1536-37 & n. 39. What was determinative was the existence of a segmented plan and the statutory mandate of the ESA, which ensured that this plan would be properly implemented. Here, we have before us a system that will serve precisely the same function and have precisely the same effect as a practical matter, though it happens to derive from a different source. It seems clear to me that False Pass applies equally to any situation presenting a process of genuinely segmented development, as both the OCSLA and the leasing scheme here do. Our prior precedent, False Pass, should therefore control this case.
 
 
 
 [1]
 The grizzly bear is listed as "threatened." The bald eagle, peregrine falcon, and gray wolf are listed as "endangered."
 
 
 [2]
 Environmental assessments are less formal and less rigorous than environmental impact statements
 
 
 [3]
 Environmental Assessment, Nonwilderness Gas and Oil Leasing in the Flathead National Forest, February 18, 1981 (Excerpts of Record (E.R.) at 175) (Flathead EA); Environmental Assessment, Nonwilderness Gas and Oil Leasing in the Gallatin National Forest, March 4, 1981 (E.R. at 311) (Gallatin EA)
 Although lease applications are filed with the Bureau of Land Management (BLM), the Forest Service has primary responsibility for both making recommendations as to specific lease sales and performing the environmental analyses required by NEPA. See 49 Fed.Reg. 37,440 (1984). The BLM may accept or reject the Forest Service recommendation based on the BLM's independent evaluation, but in practice the BLM generally accepts the Forest Service recommendations.
 
 
 [4]
 Decision Notice and Finding of No Significant Impact, Nonwilderness Gas and Oil Leasing in the Flathead National Forest, February 18, 1981 (E.R. at 176) (Flathead FONSI); Decision Notice and Finding of No Significant Impact, Nonwilderness Gas and Oil Leasing in the Gallatin National Forest, March 4, 1981 (E.R. at 312) (Gallatin FONSI)
 
 
 [5]
 By "oil and gas activities," we include all activities undertaken by oil and gas lessees, including exploration, development, production, and abandonment
 
 
 [6]
 Apparently even NSO leases may include the standard stipulations. See Flathead EA at 67 (Appendix E) (E.R. at 245)
 
 
 [7]
 See infra Part III
 
 
 [8]
 The Mountain States Legal Foundation, the Rocky Mountain Oil and Gas Association, the Independent Petroleum Association of America, and the Independant Petroleum Association of Mountain States also intervened. For convenience, we refer to all the intervenor-appellants as the "lessees."
 
 
 [9]
 The district court granted the motion to intervene "for purposes of protecting the right to appeal." See Clerk's Record (C.R.) 116. Because the lessees "step into the shoes of the defendants for the purposes of appeal," they may raise those issues which the federal defendants raised in the district court. See Garrity v. Gallen, 697 F.2d 452, 457 (1st Cir.1983)
 
 
 [10]
 We refer to the original federal defendants as the "federal appellants."
 
 
 [11]
 The government does not appeal that portion of the judgment which set aside the agency actions in issuing non-NSO leases in "roadless" areas of the two forests. See Brief for the Federal Appellants at 14, 37-38. The Forest Service Manual defines a "roadless area" as "[a]n area of undeveloped Federal land within which there are not improved roads maintained for travel by means of motorized vehicles intended for highway use." FSM Sec. 8260(b)(3)(a)(1). The distinction between "roadless" and "roaded" areas is relevant only to the point that the roadless areas studied in the two EAs continue to be eligible for "wilderness" designation in the future. See California v. Block, 690 F.2d 753 (9th Cir.1982). Lands which are designated wildernesses receive additional environmental protections beyond those already applicable to national forest lands. Half the lands considered in the two EAs were "roaded" areas, however, that have never been considered for wilderness designation
 In explaining why it has not appealed with respect to non-NSO leases in roadless areas, the government has advised the court that the Forest Service is currently preparing an EIS for the roadless areas of the Gallatin and has recently completed a new EIS for the roadless areas of the Flathead. See Brief for the Federal Appellants at 14 n. 9.
 
 
 [12]
 We review the district court's grant of summary judgment de novo. Jantzen, 760 F.2d at 981
 
 
 [13]
 The "irreversible and irretrievable commitment of resources" criterion is derived from 42 U.S.C. Sec. 4332(C)(v) which requires an EIS to include a statement of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." Obviously this requirement only makes sense if the EIS is prepared prior to the commitment of resources
 
 
 [14]
 Because we are not faced with a challenge to any specific activity, we need not address what constitutes a "surface-disturbing activity" prohibited by the NSO stipulation
 
 
 [15]
 On remand, the district court shall determine which leases are in fact NSO leases within the meaning of this opinion because it is not clear whether, as a matter of contract interpretation, every lease with a "no surface occupancy" (NSO) stipulation provides absolute protection against surface-disturbing activity. The blanket "No Surface Occupancy Stipulation" in the record would seem to provide such protection, but we cannot determine from the record what alterations or additions to the stipulation have been made in individual cases. Moreover, it appears that some leases included both the NSO provision and a Surface Disturbance Stipulation which provides in part that the Forest Service may only impose "such reasonable conditions, not inconsistent with the purposes for which this lease is issued, as the Supervisor may require to protect the surface of the leased lands and the environment." See Flathead EA at 68 (Appendix E) (E.R. at 246) (emphasis added). If so, the language of the Surface Disturbance Stipulation would have to be construed with the NSO Stipulation to determine which was intended to govern the lease. The analysis that follows in Part II(A) of this opinion applies only if the language of the stipulation, construed with the rest of the lease, absolutely prohibits surface disturbance in the absence of specific government approval
 
 
 [16]
 Despite this absolute control by the government, NSO leases have economic value because they give the lessees the exclusive right of development, should development be allowed. In this sense, an NSO lease is effectively a right of first refusal to produce oil and gas on the leased premises. Moreover, oil and gas reserves may be tapped without disturbing the surface (and thus without governmental approval under an NSO provision), through directional drilling or well spacing
 
 
 [17]
 The federal appellants do not challenge on appeal that portion of the district court's judgment that applies to non-NSO leases located in "roadless" areas of the two forests. See supra note 11. Their arguments as to the validity of non-NSO lease sales without an EIS are limited to lease sales in "roaded" areas only. The lessees, however, appeal the judgment below as applied to non-NSO leases in both roaded and roadless areas. Because the federal appellants raised the issue of non-NSO leases in roadless areas below, see C.R. 124, the lessees may raise this issue on appeal. See supra note 9
 In distinguishing between roadless and roaded areas in the two forests, all appellants argue that oil and gas development and production will have comparatively little impact on roaded areas. However, we find nothing in the record to show that the mere fact that a parcel of national forest land is "roaded" renders the environmental impact oil and gas activities insignificant. In fact, there is nothing in the record to indicate that the effects of oil and gas activities in roaded areas are generally less severe than their effects in roadless areas. The EAs do not attempt to distinguish roaded land as significantly less affected by oil and gas development and production than roadless areas. Indeed, it seems to us that the cumulative impact of oil and gas activities in an area already somewhat disturbed by human contact could be even more significant than similar activities in a more pristine area. Since we find nothing in the record to support appellants' position, we reject the suggestion that our analysis should treat roaded areas differently from roadless areas.
 
 
 [18]
 By asserting that the government cannot prevent surface-disturbing activities altogether, we do not intend to impugn the government's independent statutory authority under the ESA to prevent any actions which would jeopardize threatened or endangered species. See infra Part III, pp. 384-396. Because that authority does not extend to the myriad of significant environmental effects outside the narrow issue of species survival, we do not consider it here
 
 
 [19]
 Additionally, NSO stipulations were attached to leases of lands designated "highly environmentally sensitive." Sierra Club v. Peterson, 717 F.2d at 1411 & n. 3
 
 
 [20]
 We recognize that in some cases, directional drilling or well spacing on other parcels would permit production to occur without disturbing the surface of the leased land. See supra at 1527-28
 
 
 [21]
 Less than 10 percent, on average, of non-competitive leases yield an oil strike and less than 2 percent lead to actual development
 
 
 [22]
 Appellants do not address the fact that exploration activities themselves may significantly affect the environment, thus requiring the preparation of an EIS
 
 
 [23]
 Although the validity of the issuance of NSO leases without the benefit of an EIS was not before the court in Sierra Club v. Peterson, 717 F.2d at 1412, the court clearly felt that the NSO alternative was a legitimate alternative for dealing with uncertainty under NEPA
 
 
 [24]
 " 'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." Interagency Cooperation--Endangered Species Act of 1973, As Amended, 51 Fed.Reg. 19,958 (1986) (codified at 50 C.F.R. Sec. 402.02 (1986))
 
 
 [25]
 Section 7(a)(2) provides more fully: "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.... In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available." 16 U.S.C. Sec. 1536(a)(2)
 
 
 [26]
 Under certain limited circumstances, the agency may be able to obtain an exemption under sections 7(g) and 7(h). See 16 U.S.C. Sec. 1536(g), (h)
 
 
 [27]
 Section 7(d) provides in full: "After initiation of consultation required under subsection (a)(2) ..., the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect or foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)...." 16 U.S.C. Sec. 1536(d)
 
 
 [28]
 See Threatened and Endangered Species Biological Evaluation (Flathead EA, Appendix G) at 82 (E.R. at 260); Biological Evaluation (Gallatin EA, Appendix B) at B1 (E.R. at 365)
 
 
 [29]
 See Interagency Cooperation--Endangered Species Act of 1973, As Amended, 51 Fed.Reg. 19,957 (1986) (codified at 50 C.F.R. Sec. 402.01(b) (1986))
 
 
 [30]
 The FWS has also emphasized that "waiting until completion of a project specific evaluation to ... apply existing biological data to formulate the necessary restrictions may result in ... areas being released for surface occupancy that, in fact, have no opportunity for surface occupancy due to irresolvable conflicts with wildlife resources." Gallatin Biological Opinion at D6 (E.R. at 400)
 
 
 [31]
 H.R.Conf.Rep. No. 96-697, 96th Cong., 1st Sess. 12, reprinted in 1979 U.S.Code Cong. & Admin.News 2572, 2576
 
 
 [32]
 E.R. at 249
 
 
 [33]
 Appellants do not mention in their briefs that the second paragraph of the T & E stipulations provides that the lessee "may, unless notified by the authorized officer of the [ ] agency that the examination is not necessary, conduct the examination ... at his discretion and cost ... by or under the supervision of a qualified resources specialist approved by the [ ] agency." See E.R. at 249. Thus, the T & E stipulations not only fail to guarantee that examinations will be undertaken by the FWS, they also fail to guarantee that the examinations will be undertaken at all
 
 
 [34]
 Appellants argue that use of the T & E stipulation supports the FWS position that protected species concerns "under Section 7 could be addressed adequately at later stages of the action through further consultation." Brief for the Federal Appellants at 47. Relying on the T & E stipulations, appellants also suggest that the FWS' determination "that the proposed lease sales would not result in an irreversible and irretrievable commitment of resources had a well-reasoned basis." Id. This is beside the point. Section 7(d) does not amend section 7(a) to read that a comprehensive biological opinion is not required before the initiation of agency action so long as there is no irreversible or irretrievable commitment of resources. See 16 U.S.C. Sec. 1536(d). Rather, section 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process. Section 7(d) is not an independent authorization for "incremental-step" consultation
 
 
 [35]
 The Supreme Court more fully explained the OCSLA procedural safeguards as follows:
 Exploration may not proceed until an exploration plan has been approved.... The plan must ... be disapproved if it would "probably cause serious harm or damage ... to the marine, coastal, or human environment...." The ... final stage is development and production. (Citation omitted). The lessee must submit another plan to Interior.... [This] plan may also be disapproved if it would "probably cause serious harm or damage ... to the marine, coastal or human environments." ... Congress has thus taken pains to separate the various federal decisions involved in formulating a leasing program, conducting lease sales, authorizing exploration, and allowing development and production.
 Secretary of Interior v. California, 464 U.S. at 339-40, 104 S.Ct. at 670 (emphasis added).
 
 
 [36]
 Although the scope of the False Pass biological opinion is not entirely clear from our opinion in that case, the district court opinion explicitly notes that the biological opinion considered both "the leasing and exploration phases of development." False Pass, 565 F.Supp. at 1157
 
 
 [37]
 Indeed, it is not even clear to which "incremental steps" of development appellants refer. Although the biological opinions issued in this case refer repeatedly to "the initial leasing phase" and "subsequent phases of oil and gas activities," they do not delineate the post-leasing phases. See, e.g., Gallatin Biological Opinion (E.R. at 396-402). Appellants, relying on the environmental assessments prepared by the Forest Service, identify five phases of oil and gas operations: preliminary investigation, exploration, development, production, and abandonment. See, e.g., Gallatin EA at 4 (E.R. at 320). By contrast, the lease sales conducted under OCSLA are statutorily divided into three stages: (1) lease sales, 43 U.S.C. Sec. 1337; (2) exploration, 43 U.S.C. Sec. 1340; and (3) development and production, 43 U.S.C. Sec. 1351
 
 
 [38]
 We note that even the latest regulations promulgated by the FWS allow a partial assessment of an action only when the activity in question is statutorily segmented. See Interagency Cooperation--Endangered Species Act of 1973, As Amended, 50 C.F.R. Sec. 402.14[k] (1986), 51 Fed.Reg. 19,957, 19,962 (1986) ("When the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the Service shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action.")
 Moreover, we seriously doubt that Congress intended to give federal agencies carte blanche to initiate, prior to the completion of a biological opinion, any program subject to continued federal control in the absence of specific congressional approval such as that embodied in OCSLA.
 
 
 [39]
 The dissent argues that False Pass is indistinguishable from this case because the "plan" adopted by the Secretary in that case is similar to the "plan" at issue here. Dissent at 1543, 1543-44. We could accept False Pass as controlling, however, only if we accept the dissent's premise that we may divorce False Pass 's regulatory scheme from the statute that gave it form and substance. False Pass certainly applies to this case by analogy, but the analogy ends where OCSLA begins. False Pass did not ignore OCSLA, nor should we in applying False Pass. We cannot accept the dissent's expansive reading of False Pass as establishing as the law of the circuit a general rule that applies to all ESA cases, not just ESA cases arising under OCSLA. See id. at 1543-44
 The dissent does not argue that the MLA establishes a segmented approach similar to OCSLA's, nor can it. See supra note 37. Instead, the dissent asserts that in False Pass we relied not only on the segemented approach of OCLSA but also on disclaimers which the Secretary had placed in the Final Notices of Sale and the Secretary's regulations, "only a portion of which had been promulgated under OCSLA." Dissent at 1544. However, the dissent's insistence that the "system" before us "will serve precisely the same function and have precisely the same effect as a practical matter" as the leasing plan approved in False Pass is not borne out by the facts of this case. See Dissent at 1543-44. First, the T & E stipulations do not guarantee that the FWS will examine leased land before surface-disturbing activities begin and do not expressly permit the Federal surface management agency to halt surface-disturbing activities once they have begun. See supra notes 32 & 33. Second, the dissent points to no regulations which provide for incremental-step consultation under the MLA or any other statute. In fact, as noted above, FWS regulations allow partial assessment of an agency action only when the action is statutorily segmented. See supra note 38.
 
 
 [40]
 Although agencies may include in their leasing programs additional safeguards which protect threatened and endangered species, such safeguards cannot substitute for an initial, comprehensive biological opinion. We do not address whether, once a comprehensive biological opinion is completed, the leasing agency can proceed with the agency action on the basis of lease stipulations which protect species
 
 
 [41]
 Our holding does not abrogate the agencies' duty of continued consultation since even the "comprehensive" biological opinions ordered here will rely on incomplete information as to the exact location, scope, and timing of future oil and gas activities. See North Slope, 642 F.2d at 610-11. When specific production information becomes available, the agencies will be able to make a more accurate assessment of the impact of various post-leasing activities
 
 
 [42]
 Rule 19(b) provides the criteria by which we determine whether an action should be dismissed if necessary parties cannot be joined. It provides in full:
 If a person as described in subdivision (a)(1)-(2) hereof [necessary party] cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 Fed.R.Civ.P. 19(b).
 
 
 [43]
 The lessees' claim that all lessees were necessary parties is merged on appeal into their argument that all lessees were indispensable parties. Even if, as the lessees assert, it would have been legally feasible to join all lessees below, that argument was not made to the district court until after it had entered judgment. Our review of the judgment below is limited to whether "in equity and good conscience" we can allow the judgment to stand. This is essentially an inquiry into whether the lessees were indispensable parties
 
 
 [44]
 The lessees attempt to limit the application of National Licorice to cases in which it is impossible to join all necessary parties without destroying the jurisdiction of the forum to hear the case. We find no such limitation in the case law. Nor was there any suggestion in National Licorice itself that it would have been impossible to join all the employees
 
 
 [45]
 The fact that the absent employees in National Licorice actually benefitted from the NLRB's restriction on the enforcement of the labor contracts was irrelevant to the Court's holding. See Pepsico, Inc. v. Federal Trade Commission, 472 F.2d 179, 188-89 (2d Cir.1972). Indeed, in two of the cases cited by National Licorice, as cases where the injunction validly interfered with the contract rights of absent parties, the absent parties were detrimentally affected by the court order. 309 U.S. at 365-66, 60 S.Ct. at 578 (citing Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1938) and Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930))
 
 
 [46]
 The court also noted that the intervenors had been aware of the litigation and yet had delayed intervening until late in the trial below. Id. at 424. It is not clear to what extent this factor also influenced the court's decision that the white officers were not indispensable parties. Nonetheless, we note even more extensive delay in intervention in this case. Indeed, the lessees did not attempt to intervene in the action below until the case was determined against the government, two years after it was first filed
 
 
 [47]
 Although the district court did not expressly consider the public rights doctrine in rejecting the lessees' motion to reopen, we may affirm on any grounds for which there is support in the record. See Lofton v. Heckler, 781 F.2d 1390, 1392 (9th Cir.1986); Seattle Times Co. v. Seattle Mailers' Union No. 32, 664 F.2d 1366, 1369 n. 2 (9th Cir.1982)
 
 
 [48]
 As it stands, the order is open to the interpretation that the leases themselves have been set aside. The court wrote that "the agency actions allowing the issuance of the oil and gas leases on the Flathead and Gallatin National Forests are HEREBY SET ASIDE. The defendants are enjoined from further recommendations to lease and issuance of leases pending compliance with NEPA and ESA." Although the government moved for clarification of the order, the district court refused
 
 
 [49]
 On appeal, we may consider modifications to a judgment in order to avoid a "joinder stymie." Provident Bank v. Patterson, 390 U.S. 102, 111-12, 88 S.Ct. 733, 739, 19 L.Ed.2d 936 (1968) (as condition of affirmance, court of appeals may properly modify district court order to account for Rule 19 interests). By modifying the district court order in this case, we avoid the unnecessarily harsh result of completely divesting the lessees of their property rights
 
 
 [50]
 The lessees argue that in a case involving similar circumstances, leaseholders were found to be indispensable to the issuance of just such an order. See Sierra Club v. Hathaway, 579 F.2d 1162, 1166 (9th Cir.1978). While it is true that the Hathaway court found that the lessees met the abstract criteria of indispensability, it also determined that, as decided, "the judgment appealed from does not in a practical sense prejudicially affect the interests of the absent parties." Id. For this reason, the court was able to affirm the judgment below without addressing whether the "public rights" doctrine would prevent the dismissal of an action where the lessees were otherwise indispensable parties. Therefore, Hathaway is not precedent on the question of the application of the public rights doctrine now before us
 The lessees' citation to Naartex Consulting Corp. v. Watt, 722 F.2d 779 (D.C.Cir.1983), is also inapposite. In Naartex, plaintiff sued to cancel oil and gas leases that it alleged had been wrongfully issued to its competitors in the application lottery. Plaintiff claimed that it had been denied a lease because various other applicants had conspired to violate the lottery's one-application-per-person rule. Thus, the suit focused mainly on plaintiff's personal right to a lease against the allegedly wrongful actions of the absent defendants. Naartex was not a public rights case, nor did the court analyze it as such. See id. at 788-89.
 
 
 [51]
 The lessees have also claimed that they were denied Fifth Amendment due process because they allegedly were not given notice and an opportunity to be heard below. Because the lessees' property interests were not adjudicated in this litigation, their right to notice and an opportunity to be heard cannot be invoked. See Sierra Club v. Watt, 608 F.Supp. 305, 325-28 (C.D.Cal.1985)