**NORTHERN PLAINS RESOURCE COUNCIL, INC., Plaintiff,**

**v.**

**UNITED STATES BUREAU OF LAND MANAGEMENT, et al., Defendants.**

**No. CV 01–96–BLG–RWA.**

United States District Court, D. Montana. Billings Division.

Dec. 10, 2003.

Douglas L. Honnold, Timothy J. Preso, Earthjustice Legal Defense Fund, Bozeman, MT, Jack R. Tuholske, Tuholske Law Office, Missoula, MT, Michael Reisner, Northern Plains Resource Council, Billings, MT, for Plaintiff.

Lorraine D. Gallinger, William W. Mercer, Office of the U.S. Attorney, Billings, MT, Lori Caramanian, U.S. Department of Justice, Denver, CO, John C. Cruden, U.S. Environmental Enforcement Section, Washington, DC, Ronald F. Waterman, Jon Metropoulos, David C. Dalthorp, Rebecca W. Watson, Gough Shanahan Johnson & Waterman, Helena, MT, John W. Ross, Brown Law Firm, Billings, MT, Charles L. Kaiser, Charles A. Breer, Davis Graham & Stubbs, Denver, CO, Darin W. Johnson, Crowley Haughey Hanson Toole & Dietrich, Billings, MT, Kemp Wilson, Office of the Carbon County Attorney, Red Lodge, MT, Stephen H. Foster, Charles E. Hansberry, Holland & Hart, Mark Errebo, Errebo Law Office, Billings, MT, Phillip Wm. Lear, Lear & Lear, Salt Lake City, UT, Gary G. Broeder, Broeder Law Offices, Billings, MT, Dana L. Hupp, Gough Shanahan Johnson & Waterman, Helena, MT, John W. Ross, Brown Law Firm, Billings, MT, Susan Brownlee Miller, Marathon Oil Company, Houston, TX, for Defendants.

## ORDER

SHANSTROM, Senior District Judge.

On September 4, 2003, United States Magistrate Judge Richard W. Anderson

issued Findings and Recommendations. [Doc. No. 248] The Magistrate Judge decided the oil and gas leases at issue, which include rights to coalbed methane, incorporate the terms of the amended Resource Management Plan and Environmental Impact Statement (1994 RMP/EIS). Further, he concluded that the rights conferred by the leases were restricted to the small-scale coalbed methane exploration and development authorized by the 1994 RMP/EIS. Therefore, the BLM was not required to produce a new EIS prior to issuing the oil and gas leases. Based on these conclusions, the Magistrate Judge recommends that summary judgment be granted in favor of Defendants and against Plaintiff.

On September 18, 2003, Plaintiff objected to the Findings and Recommendations. [Doc. No. 252] Defendants filed separate responses to the objections, some substantive and others not. [Doc. Nos. 255, 256, 257, 258,259, 260, 263] Having reviewed the briefs, the Findings and Recommendations, Plaintiff's objections, and Defendants' responses to those objections, this Court considered de novo the motions for summary judgment. *See* 18 U.S.C. § 636(b)(1). The Court adopts the Magistrate Judge's Findings and Recommendations.

In his Findings and Recommendations, the Magistrate Judge also recommends that this Court direct the Clerk of Court not to enter judgment. The basis for this recommendation is that Count VI is not addressed in the motions for summary judgment. However, since the Findings and Recommendations were issued, I dismissed Count VI pursuant to stipulation by the involved parties.

Based on the foregoing, **IT IS ORDERED:**

1) The Findings and Recommendations of the Magistrate Judge are **adopted.** [Doc. No. 148]

2) Defendants' motions for summary judgment are **granted.** [Doc. Nos. 166, 167, 168, 169, 173, 174, 175, and 194]

3) Plaintiff's motion for summary judgment is **denied.** [Doc. No. 170]

4) The Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff.

The Clerk of Court is directed to notify the parties of the making of this Order.

## FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

ANDERSON, United States Magistrate Judge.

Pending before the Court are the parties' cross motions for summary judgment in this action for judicial review of the Bureau of Land Management's oil and gas leasing decisions and approvals of applications for permits to drill for coalbed methane. Having considered the briefs of the parties, the administrative record, and the arguments advanced in open court on July 16, 2003, the undersigned is prepared to rule.

### PROCEDURAL HISTORY

Plaintiff, Northern Plains Resource Counsel, an environmental organization comprised of farmers, ranchers, and conservationists, brought this action for declaratory and injunctive relief under the Administrative Procedures Act (APA), 5 U.S.C. § 702 *et seq.*. Plaintiff alleged that the Bureau of Land Management (BLM) violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.,* the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.,* and

the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 *et seq.*, by issuing oil and gas leases in the Billings and Powder River Resource Areas and approving applications for permits to drill for coalbed methane in the Tongue River Coalbed Methane Project without preparing a supplemental environmental impact statement and amending the existing resource management plan.

In October 2002, the undersigned recommended that plaintiff's motion for preliminary injunction be denied. Over plaintiff's objection, that recommendation was adopted by the District Court on December 11, 2002. Now pending are the parties' cross motions for summary judgment on the merits of plaintiff's allegations.[1]

## BACKGROUND

This case arises out of the anticipated coalbed methane boom in the Powder River and Billings Resource Areas of southeastern Montana. Coalbed methane (CBM) is a form of natural gas found in coal seams, which also serve as aquifers. To extract the gas, the water in the coal seam is depressurized by pumping groundwater out of the seam. The process can result in the production of a large quantity of produced water, which can impact the surrounding environment.

BLM treats CBM as part of the oil and gas estate. It does not issue CBM leases separate and apart from conventional oil and gas leases.

BLM administers the federal oil and gas estate through land use plans known as Resource Management Plans (RMPs).

Among other things, RMPs designate (1) lands that will be open to oil and gas development, and (2) "levels of production or use to be maintained" or those lands open to development. 43 C.F.R. § 1601.0–5(k)(2).

In 1984 and 1985, BLM prepared RMPs and EISs for the Billings and Powder River Resource Areas. These documents addressed all manner of activities in the resource areas, including the effects of oil and gas leasing and development on water, air, soils, cultural resources, wildlife, and other resources.

In the early 1990s, BLM decided to amend the RMPs and prepared an EIS devoted entirely to the impacts of oil and gas leasing in the Powder River, Billings, and South Dakota Resource Areas.[2] The environmental impacts of oil and gas development were analyzed assuming a reasonably foreseeable development scenario (RFD). The RFD projected a total of 1293 oil and gas wells over 15 years, 402 of which were expected to be federal wells.

At the time BLM prepared the oil and gas EIS, only low levels of development of CBM were anticipated. For this reason, BLM analyzed only the environmental impacts of limited CBM development. Determining that small-scale development of CBM would not cause significant environmental impacts, BLM determined that the RFD projections could accommodate some exploratory drilling. BLM recognized, however, that the quantity of produced water associated with CBM production was an unknown factor, and concluded that further environmental studies would have

---

1. Count 6 of the second amended complaint, which alleges that defendant Fidelity Exploration & Production Company, the owner and operator of the Tongue River Coalbed Methane Project near Decker, Montana, violated the Clean Water Act, 33 U.S.C. § 1341, is not in issue in the present motions. This claim

has been stayed by the Court's orders of March 6 and August 28, 2003.

2. This action does not include questions about leasing decisions made in the South Dakota Resource Area.

to be completed before commercial production would be allowed. The 1994 RMP/EIS provided:

> The Reasonably Foreseeable Development projections can accommodate the drilling of test wells and initial small-scale development of coalbed methane.... This amendment does not contain either a hydrologic analysis of the RFD area or an environmental study of the impacts of building major pipeline systems. In order for full-field development to occur on Federal oil and gas lands, an additional environmental document tied to this amendment would be required.

A.R. Ex. 3, Tab C, 1789.

BLM signed the Record of Decision approving the amended RMP/EIS on February 2, 1994.[3] Plaintiff did not appeal or protest the 1994 RMP/EIS and its validity is not in question in this action. *See* Findings and Recommendations of Magistrate Judge, October 7, 2002, at 9 (Challenges to the 1994 RMP/EIS are barred by the statute of limitations.).

Between 1997 and 2001, BLM held 23 competitive lease sales. Prior to the sales, the agency prepared Documentation of Land Use Plan Conformance and NEPA Adequacy (DNA) worksheets. BLM concluded that the lease sales conformed to the existing 1994 RMP/EIS.

BLM approved 40 applications for permit to drill (APDs) for CBM. Of these, 11 were approved between 1994 and 1997 for exploratory drilling in the Tongue River CBM Project owned by defendant Fideli-ty.[4] Prior to approval of each of the 11 APDs, BLM performed an environmental analysis (EA). In each EA, BLM determined that, with mitigation measures, the proposed drilling would result in no significant impacts and an EIS would not be required.

In 1998, Fidelity sought to further develop the Tongue River CBM Project. At full production, Fidelity planned to produce CBM from a maximum of 250 wells, 111 of which would have been federal wells. BLM conducted an EA and preliminarily concluded that there would be significant impacts from the project. In July 2000, BLM gave Fidelity four options: modify the proposal to eliminate the significant impacts, drop the proposal, prepare a programmatic EIS, or prepare a site-specific EIS.

About the same time, in October 2000, at a meeting of the Coal Bed Methane Coordination Group, industry predicted that it would drill approximately 10,000 CBM wells in the Montana portion of the Powder River Basin over the next 10 years, in addition to an unspecified number of conventional oil and gas wells. BLM recognized at that point that full-field CBM development was on the horizon. In December 2000, BLM published a notice of intent to prepare an EIS to consider amendment of the Powder River and Billings RMPs. In January 2003, the Montana Final Statewide Oil and Gas Environmental Impact Statement and Proposed Amendment of the Powder River and Billings Resource Management Plans was published (hereinafter 2003 FEIS).[5]

---

3. Hereafter, the amended RMP/EIS will be referred to as the 1994 RMP/EIS.

4. Actually, the field was owned by Fidelity's predecessor-in-interest, Redstone Gas Partners LLC. Both Redstone and Fidelity will be referred to as Fidelity.

5. The 2003 FEIS is mentioned only for background information. Nothing said in this opinion is meant to approve or disapprove of the validity of that document. Those questions are the subject of other cases pending before the Court: *NPRC v. United States BLM,* Cause No. CV 03–69–BLG–RWA; *Western Org. of Resource Councils v. Clarke,* Cause No.

In the fall of 2002, Fidelity requested and received a suspension of its federal leases during the pendency of the EIS. Many of the leases of the other lessee defendants have likewise been suspended.

## DISCUSSION

■ Under the APA, judicial review is limited to the administrative record that was before the agency at the time it made its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court reviews the record to determine whether agency decisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). In the usual case, the court does not review the facts *de novo*. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir.1985). Instead, it examines the facts to ascertain whether "as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*

In the Court's findings and recommendations on plaintiff's motion for preliminary injunction, the Court found that plaintiff could not challenge either the 1994 RMP/EIS or the sufficiency of the process that resulted in the 2003 FEIS. The Court narrowed the issue to be decided on the merits to the following:

> The question to be decided at later proceedings is whether the 1994 [RMP/EIS] permitted the level of CBM activity approved by BLM or whether BLM should have completed an EIS and amended its RMPs prior to issuing non-NSO leases and approving APDs.[6]

CV 03–70–BLG–RWA; *American Lands Alliance v. United States BLM,* Cause No. CV 03–71–BLG–RWA; *Northern Cheyenne Tribe v. Norton,* Cause No. CV 03–78–BLG–RWA.

**6.** An NSO lease forbids the lessee from occupying or using the surface of the leased land.

Findings and Recommendations, October 7, 2002, at 14.

Plaintiff asserts that the answer to this question no, the 1994 RMP/EIS did not permit the level of CBM activity approved by BLM. Plaintiff finds support for its answer in *Conner v. Burford,* 848 F.2d 1441 (9th Cir.1988), where the Ninth Circuit held that the issuance of a non-NSO lease, that is, one that does not absolutely preclude surface-disturbing activity, constitutes an irreversible and irretrievable commitment of resources, triggering BLM's obligation under NEPA to prepare an EIS. 848 F.2d at 1451.

*Conner* is distinguishable from the case at bar, however, in that no EIS had been performed prior to the lease sales in question in *Conner.* Here, on the other hand, BLM conducted an EIS and amended its RMPs in 1994, prior to approving APDs and issuing leases.

Plaintiff contends, nevertheless, that the 1994 RMP/EIS cannot serve as the requisite pre-leasing EIS because that document did not consider the consequences of CBM production. Plaintiff misunderstands the 1994 RMP/EIS. While that document did not analyze the impacts of full-field CMB production, it did analyze the impacts of limited development of CBM, concluding that no significant environmental impacts would occur from exploratory drilling and small-scale CBM production. The 1994 RMP/EIS specifically found that the reasonably foreseeable development scenario could accommodate the drilling of test wells and a limited

*Conner v. Burford,* 848 F.2d 1441, 1447 (9th Cir.1988). A non-NSO lease permits regulation of operations but does not absolutely prohibit the lessee from disturbing the land's surface. *Id.* at 1448–49.

amount of production. Because it did not analyze the effects of commercial development of the mineral, the 1994 RMP/EIS recognized that further environmental studies would be needed before large-scale CBM production could be allowed.[7]

BLM's actions have conformed to the 1994 RMP/EIS. The 11 APDs in the Tongue River CBM Project were all approved for test wells only. They have not resulted in production of CBM. All 11 of the APDs therefore fall within the scope of exploratory drilling contemplated by the 1994 RMP/EIS.[8]

■ The leases themselves are somewhat more problematic. Under 43 C.F.R. § 3101.1–2, the holder of a federal lease has the right to develop mineral interests. The regulation provides:

> A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold subject to: Stipulations attached to the lease; restrictions deriving from specific, nondiscretionary statutes; and such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time the operations are proposed.

Plaintiff maintains that BLM has consistently construed this regulation to mean that, unless the lease includes stipulations expressly restricting development, a federal lessee has the absolute right to develop the full mineral estate. Plaintiff correctly observes that BLM's interpretation of its regulations constitutes persuasive authority. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Nevertheless, the agency's interpretation is not controlling. *Id.*

The Court agrees that § 3101.1–2 grants the leaseholder the right to develop mineral interests. However, it does not agree that, due to BLM's failure to include stipulations pertaining to CBM, the leases allowed the absolute right to full-field development of CBM resources. Regardless of BLM's interpretation of § 3101.1–2,[9] a reading of the leases shows that they did not in fact convey development rights any greater than those authorized by the 1994 RMP/EIS.

The standard leases issued to the lessees were specifically made subject to applicable laws, regulations, and orders. The leases provided:

> Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease.

A.R. Ex. 3, Tab C., at 1955.

Thus, under their very terms, the leases were subject to all laws and regulations, including 43 U.S.C. § 1732, which mandates BLM to manage public lands in ac-

---

**7.** As noted previously, the validity of the 1994 RMP/EIS is incontrovertible. *Supra* at 1021.

**8.** Plaintiff's second amended complaint challenges only those APDs issued for the Tongue River CBM Project. Thus, the Court has discussed only the 11 issued to Fidelity for drilling within that project, even though the rec-

ord indicates that up to 40 APDs may have been approved. In any event, there is no evidence that any of the remaining APDs allowed anything other than test wells.

**9.** And the Court is not convinced, in this case, that BLM construed the regulation to allow full-field CBM production.

cordance with land use plans, and 43 C.F.R. § 1610.5–3, which requires all resource management actions, such as leasing, to conform to approved land use plans.[10]

Here, the land use plan in existence at the time the leases were issued was the 1994 RMP/EIS. Pursuant to 43 U.S.C. § 1732 and 43 C.F.R. § 1610.5–3, which were incorporated into the terms of the leases, the rights to develop the leasehold interest were subject to and limited by the provisions of the 1994 RMP/EIS. Accordingly, the lessees were granted only the right to undertake exploratory drilling and small-scale development of CBM resources.[11]

The record demonstrates that BLM complied with NEPA and the FLMPA in its management decisions concerning CBM. It performed an EIS and amended the applicable RMP in 1994. That environmental document considered the effects of exploration and limited development of CBM and determined that there were none. BLM issued standard oil and gas leases that were subject to the RMP. It approved only those APDs which sought to test and explore for, not develop, CBM resources. Once it recognized that full-field CBM development was a genuine possibility, it commenced a statewide EIS.

While undergoing that EIS it was not required to halt lease sales, as long as they were in conformance with the existing plan. *ONRC Action v. BLM,* 150 F.3d 1132, 1137 (9th Cir.1998).

In sum, the answer to the issue framed by the Court in its previous findings and recommendations is yes, the 1994 RMP/EIS authorized the level of CBM activity permitted by BLM. Even though those leases did not include stipulations specifically restricting CBM development, the leases themselves incorporated the terms of the 1994 RMP/EIS, thereby confining the rights of the lessees to limited, small-scale CBM exploration and development. BLM therefore was not required to perform a new EIS prior to issuing the oil and gas leases, nor was it required to halt issuance of the leases pending completion of the 2003 FEIS.

### RECOMMENDATION

In accordance with the foregoing, the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), **RECOMMENDS** as follows;

1. Plaintiff's motion for summary judgment (docket no. 170) be denied.

---

**10.** 43 U.S.C. § 1732(a) provides:

> The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available[.]

43 C.F.R. § 1610.5–3(a) similarly provides:

All future resource management authorizations and actions, as well as budget or other action proposals to higher levels in the Bureau of Land Management and Department, and subsequent more detailed or specific planning shall conform to the approved plan.

**11.** Defendants also contend that the following provision in the lease further limits their right to produce CBM:

> To the extent that impacts from mining operations would be substantially different or greater than those associated with normal drilling operations, lessor reserves the right to deny approval of such operations.

A.R. Ex. 3, Tab C, at 1956.

Defendants may very well be correct in their contention. However, because neither the record nor the parties define what constitutes a "normal drilling operation," the Court does not rely on this provision in determining that the leases did not authorize full-field CBM development.

2. Defendants' motions for summary judgment (docket nos. 166, 167, 168, 169, 173, 174, 175, and 194) be granted.

Under 28 U.S.C. § 636(b)(1) and Rule 72(b), Fed.R.Civ.P., the parties may serve and file written objections within 10 days of receipt of these recommendations.

If the District Court adopts these findings and recommendations, the Clerk of Court should not be directed to enter judgment because Count 6 between plaintiff and defendant Fidelity remains outstanding.

The Clerk of Court shall forthwith forward copies of these findings and recommendations to counsel of record.

September 4, 2003.